IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LOUIS F. WATASHE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CV-370-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Louis F. Watashe ("Watashe"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Watashe's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Watashe appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred in failing to perform a proper credibility determination. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Watashe was 48 years old at the time of his asserted date of disability, March 7, 2005. (R. 44). He had an eleventh grade education. (R. 46). Watashe testified that he did not have a driver's license because it was taken away following a DUI four to six years earlier. (R. 51). Watashe testified that he occasionally drank, and that the last time that he drank alcohol was two

1

months before the hearing. (R. 59). The last day Watashe worked was March 7, 2005. (R. 47-48).

Watashe testified that he had chronic neck and back pain. (R. 50-51). When asked if surgery on his back or neck had ever been recommended, Watashe testified that it had not, although it could be a possibility. (R. 53). Watashe had collapsed about three times due to his back problems. (R. 54). He testified that doctors had told him this could be due to a pinched nerve or a ruptured disk. (R. 55).

Watashe testified that he felt a burning sensation in his neck and on occasion had headaches that would last for fifteen to twenty minutes. (R. 51). Watashe would sit down and relax when he got these headaches. *Id.* His headaches were not affected by noise or bright lights. *Id.* Watashe did not take any medication when he got these headaches. *Id.* Watashe testified that he sometimes experienced pain in his neck when he nodded or moved his head from side to side. *Id.* He experienced dizziness every day. (R. 52). The dizziness often occurred when his neck began to hurt. *Id.* Watashe had seen a neurosurgeon about his dizziness and was waiting for a referral at the time of the hearing. (R. 53).

Watashe testified that he had a swollen prostate and he took medication for this. (R. 60). He testified that he had some trouble urinating. (R. 53). He testified that he went to the restroom approximately four times a day. (R. 67). Watashe had stomach pain on the right side of his stomach. *Id.* Watashe testified that one time following severe stomach pain he went to the doctor where blood was found in his urine and stool. (R. 54).

Watashe testified that he was unable to bend over to touch his knees or toes. (R. 57). He was able to squat and get back up, although it would take him "a little time to get back up." *Id.* He testified that he used a cane to walk, although he did not bring it with him to his hearing

because he did not feel he needed it. (R. 58). He wore a back brace daily that he obtained at a garage sale after workers compensation insurance would not approve one that was recommended by a doctor. (R. 64-65). Watashe testified that he could walk fifty yards, sit for a period of thirty minutes before having to adjust his position, and stand for ten to fifteen minutes before having to sit down. (R. 63). Watashe stated that he was able to lift up to ten pounds. (R. 64). When asked if he was able to walk up a flight of stairs, Watashe stated that he thought he could, but that it would sometimes cause him difficulty. (R. 57).

He testified that he moved around his house often and was able to complete basic household chores such as sweeping, doing the laundry, cooking, shopping, and making his bed. (R. 61). His 15-year-old daughter would often help him do these household chores. (R. 66). Watashe had swelling in his left hand each morning that would last three to four hours and affected his ability to use and grip with that hand. (R. 58). He had no problems using his right hand. *Id.* He sometimes felt pain in his neck when he extended his reach. (R. 57). At the hearing Watashe stated that due to his back pain he was only able to sleep for four hours a night and that he took a thirty-minute nap each day. (R. 62-63). He felt exhausted on days when he was not able to nap. *Id.* He had no problems interacting with people. (R. 64). He felt that he could do a sit-down job at the time of the hearing. (R. 68).

Watashe was admitted to the emergency room at SouthCrest Hospital for back pain following an on-the-job injury on March 7, 2005. (R. 170). Upon his arrival at the emergency room, Watashe reported his pain level at an 8 on a scale of 1 to 10. *Id.* Watashe was diagnosed with a neck sprain and end-plate fracture of vertebrae levels L1 and L2. (R. 173, 195). CT scan of the lumbar spine revealed minor end-plate fractures of vertebrae levels L1-L2 and superior end-plate compressions anteriorly. (R. 181). The test also revealed minor disk space bulging at

3

vertebrae levels L3-L4, L4-L5, and L5-S1. *Id.* X-rays of the lumbar spine confirmed the superior end-plate fractures and mild compressions of vertebrae levels L1-L2. (R. 182). X-rays of the dorsal spine showed mild osteophytic spurring in the lower dorsal vertebrae and no evidence of a fracture in the lower dorsal spine. (R. 183). Cervical spine X-rays showed no evidence of fracture, but did reveal cervical osteophytic spurring in vertebrae levels C4, C5, and C6. (R. 184). Watashe was discharged later that day, and he was prescribed pain medications upon his release. (R. 195).

Watashe was admitted to the emergency room at St. John, Sapulpa, with sharp pain in his left chest radiating into the left arm on November 2, 2005. (R. 201). He was treated with nitroglycerin, oxygen, and aspirin, and the pain subsided. *Id.* Physical examination revealed tenderness and muscle spasm in the T10 to L2 vertebrae region. (R. 204). Watashe denied any further chest pain after treatment. *Id.* X-rays were within normal limits, and he was subsequently discharged. *Id*.

The medical records reveal that Watashe received treatment for back pain at Claremore Indian Hospital from the dates of July 16, 2004 to May 24, 2006 and at Okemah Creek Nation Hospital several times from the dates February 14, 2007 to March 3, 2007. (R. 213-14, 231-54, 293-320). Through referral of Dr. Parton at Okemah Creek Nation Hospital, Watashe had an MRI of the cervical and lumbar spine at MCI Diagnostic Center and a CT of the cervical spine at Diagnostic Imaging Associates on November 29, 2007. (R. 297-98, 303). MRI of the cervical and lumbar spine revealed mild degenerative disk disease throughout the cervical spine, degenerative disk disease at vertebrae levels L5-S1, and focal disk space narrowing of vertebrae C6-C7. (R. 297-98). CT of the lumbar spine also revealed degenerative disk disease at L5-S1 as well as bilateral facet arthritis. (R. 303). Watashe was given prescriptions for various pain

4

medications. (R. 296, 299, 302).

Watashe underwent an MRI of the abdomen and spine on September 13, 2007 and a CT scan of the abdomen and pelvis on September 9, 2008 because of abdominal pain. (R. 38, 304). Both of these studies were noted to be unremarkable. *Id.*

Watashe was referred by his treating physician to Dr. Daniel Boedeker and was seen on November 5, 2007 and on December 26, 2007 for consultation on his lower back pain and MRI of both his cervical and lumbar spine. (R. 273-79). These scans revealed a mild amount of degenerative change in the cervical spine. (R. 273). Dr. Boedeker also noted that there was degeneration in the lumbar spine at vertebrae levels L5-S1. (R. 273-74). Dr. Boedeker stated that the MRI scans "[did] not look that bad" and that he did not feel that surgery was necessary. (R. 273). Watashe was given a prescription of Voltaren and a referral for physical therapy for both his neck and lower back. *Id*. Dr. Boedeker noted that he did not need to see Watashe again. *Id.*

From January 10, 2008 to February 8, 2008 Watashe attended physical therapy at Koweta Indian Health Facility. (R. 280-92). During this time there was little change in his condition. *Id.*

Watashe was seen by J. Wade, M.D. on September 8, 2008. (R. 321-23). Dr. Wade's physical examination showed pain in the left leg in straight leg raising and difficulty when leaning forward or backward. (R. 323). Dr. Wade noted that an MRI suggested degenerative disease but more studies would be needed for a more definite diagnosis. *Id.*

A CT of the thoracic spine was done at Koweta Indian Facility on September 9, 2008. (R. 36). The exam revealed spondylotic changes in the lower cervical spine, no significant spondylotic or disk herniation changes in the thoracic spine, mild facet arthropathy in the lower thoracic spine, thickening of ligamentum flavum with calcifications at vertebrae level T9-T10,

and mild dextrocurvature of the thoracic spine. *Id.*

As part of his workers compensation proceedings, Watashe was seen for a consultative medical evaluation by John Hallford, D.O. (R. 225-30). In a letter dated January 10, 2006, Dr. Hallford stated that his examination of Watashe revealed tenderness to palpation from vertebrae levels C2 through T6. (R. 229). He also noted restricted range of motion in the cervical spine and lumbar spine secondary to pain. *Id.* Watashe's gait slightly favored his left leg and straight leg raising was positive on the left at 45 degrees for pain and tingling extending into that leg and positive on the right at 45 degrees for back pain. *Id.* Dr. Hallford's report revealed that Watashe continued to have "objective evidence of ongoing injury with continued loss of range of motion in the neck and back and palpable muscle spasms." (R. 230). Dr. Hallford noted that in his opinion Watashe needed to undergo MRI scan on his lumbar spine and consult an orthopedic specialist. *Id.* He also recommended treatment such as epidural steroid injections, bracing, and formal physical therapy. *Id.* Dr. Hallford ended his report stating that in his opinion, Watashe was temporarily totally disabled until he had been fully treated for his injuries. *Id.*

In another letter dated May 18, 2006 Dr. Hallford noted that Watashe had been released from his treatment at Claremore Indian Hospital as of April 11, 2006, although he had continued to have severe back pain. (R. 226). His report stated that future treatment should remain symptomatic and include moist heat, liniment, and over the counter or prescription medication. (R. 228). Dr. Hallford noted that Watashe had physical limitations on heavy lifting, repetitive squatting, or stooping. (R. 227). He again stated that in his opinion, Watashe was completely disabled from the date of onset disability, March 7, 2005, until the date of his release, April 11, 2006. *Id.* Dr. Hallford stated that in his opinion Watashe had incurred a 34% permanent impairment which included a 2% partial disability for thoracic strain pattern, 10% for his

6

compression fractures at L1-L2, 7% for chronic lumbar strain pattern with unoperated disc herniation at the vertebrae level L5-S1, 13% for range of motion loss, and 2% for radiculitis affecting Watashe's left leg. *Id.*

Watashe was examined by agency consultant Dr. Melanie Munn, M.D. on March 22, 2007. (R. 255-59). The examination showed that Watashe was alert and cooperative and had no hearing or conversational difficulties. (R. 256). The examiner's assessment showed the claimant had degenerative disc disease, mild herniated discs of the cervical and lumbar spine, back and neck pain with radiculopathy, and lumbar compression fractures. *Id.* The assessment further showed that Watashe walked with an antalgic gait favoring his left with appropriate speed without the use of any assistive devices. *Id.* On Watashe's range of motion test, Dr. Munn noted Watashe as having limited back extension, back flexion, and left and right back lateral flexion. (R. 257). Dr. Munn also noted limitations in Watashe's range of motion in his neck extension, neck flexion, right and left hip flexion, and his left and right internal hip rotation. *Id.* In testing the lumbosacral spine, Dr. Munn noted that pain was present and Watashe had a limited range of motion in flexion, and extension. (R. 259). Scoliosis was not present. *Id.* Pain was also present during his cervical spine range of motion test which noted Watashe as having limits in flexion, extension, and right and left rotation in the cervical spine. *Id.*

A Physical Residual Functional Capacity Assessment was completed by non-examining agency consultant Kenneth Wainner, M.D. on April 19, 2007. (R. 261-68). The assessment noted that Watashe could occasionally lift up to twenty pounds, frequently lift ten pounds, stand or walk six hours in an eight-hour work day, and sit about six hours in an eight hour work day. (R. 262). Dr. Wainner assessed no limitations in Watashe's ability to push or pull. *Id.* In explaining how the evidence supported this determination regarding Watashe's exertional

limitations, Dr. Wainner noted that the medical records following Watashe's on-the-job injury revealed that there were minor disc bulges without herniation in vertebrae levels L3-S1 and facet hypertrophy at vertebrae levels L4-L5. (R. 262). He noted that there was no spinal stenosis or neuroforaminal narrowing. *Id*. He noted that the neck had spurs at vertebrae level C3-C6 and had normal discs. *Id*. The thoracic spine had very minor endplate compression fracture of vertebrae T1 and T2. *Id*. In Dr. Wainner's opinion, the treating physician records did not note the minor nature of the changes, which he described as nearly normal for someone of Watashe's age. *Id*. Summarizing the findings of Dr. Hallford, Dr. Wainner noted that Watashe had limited motion in his lumbar spine, tenderness in his cervical spine, positive straight leg raising, and no sensory defects. *Id*. Dr. Wainner also summarized the findings of Watashe's consultative examination by Dr. Melanie Munn. (R. 262-63). Dr. Wainner stated that it was "very curious" that radicular symptoms were present without corresponding findings by the imaging tests. (R. 263). Dr. Wainner believed that Dr. Munn's diagnosis of herniated discs had no evidentiary basis. *Id*. When assessing postural limitations, Dr. Wainner stated that Watashe could occasionally climb and stoop as well as frequently balance, kneel, and crouch. *Id*. Dr. Wainner's assessment included no manipulative, visual, communicative, or visual limitations. (R. 264-65).

## Procedural History

On November 1, 2006, Watashe protectively filed applications for disability insurance benefits and supplemental security income under Title II and Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 126-30). In these applications, Watashe alleged disability beginning March 7, 2005. (R. 44, 126). Watashe's applications for benefits were denied in their entirety initially and on reconsideration. (R. 87-102). A hearing before ALJ Gene M. Kelly was held November 18, 2008 in Tulsa, Oklahoma. (R. 39-80). At the time of the hearing, the alleged onset date of

disability was amended to December 11, 2006. (R. 9, 78-79). By decision dated January 15, 2009, the ALJ found that Watashe was not disabled at any time through the date of the decision. (R. 6-18). On April 17, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981, 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past

9

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The Court's review is based on the record taken as a whole, and the Court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Watashe met insured status through June 30, 2010. (R. 11). At Step One, the ALJ found that Watashe had not engaged in any substantial gainful activity since December 11, 2006, the amended alleged date of the onset of disability. *Id.* At Step Two, the ALJ found that Watashe had severe impairments of problems with his neck, back, left leg, left hand, headaches, dizziness, bladder, stomach, and prostate. *Id.* The ALJ discussed Watashe's alleged impairments related to sleep apnea and substance abuse and concluded that they were non-severe. *Id*. At Step Three, the ALJ found that Watashe did not have an impairment or

---

relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

combination of impairments that was medically equal to the listings. (R. 12).

The ALJ determined that Watashe had the following RFC:

> [T]o lift and/or carry 20 pounds, stand and/or walk 6 hours in an 8 hour workday at 30 minute intervals, sit 6 hours in an 8 hour workday at 1 hour intervals, occasionally bend, stoop, squat, kneel, crouch, crawl, climb, push and/or pull with his left upper extremity and operate foot controls with his left lower extremity. He is slightly limited in his ability to finger, feel, and grip with his left upper extremity and twist/nod his head. The claimant should avoid rough, uneven surfaces, unprotected heights, and fast and dangerous machinery and requires easy accessibility to rest rooms. Additionally, the claimant is able to perform simple, repetitive and routine tasks.

*Id.* At Step Four, the ALJ found that Watashe could not return to any past relevant work. (R. 16). At Step Five, the ALJ found that there were a significant number of jobs that Watashe could perform. (R. 17). Therefore, the ALJ found that Watashe was not disabled at any time through the date of his decision. (R. 18).

### Review

Watashe asserts that the ALJ erred in his credibility assessment. The undersigned finds that substantial evidence supports the ALJ's credibility assessment and the ALJ's decision complies with legal requirements. Therefore, the ALJ's decision is affirmed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ extensively summarized Watashe's testimony, and he included many specific quotes. (R. 12-14). This summary included Watashe's testimony that he could perform a sit-down job. (R. 13). The ALJ then explained in that portion of his decision in which he discussed Watashe's credibility that Watashe's description of his limitations was "inconsistent and unpersuasive." (R. 16). He gave several examples of this:

> It must be noted that when questioned at the time of the hearing, the claimant repeatedly stated "sometimes" when questioned in reference to limitations and pain and/or difficulties. As related to this, the claimant appeared to be inconsistent with [] his answers, stating "sometimes" he has difficulty going up and down stairs, "sometimes" he has [] pain in his lower neck with reaching in any direction and he also stated he "sometimes" falls.

*Id.* Thus, the ALJ gave a legitimate reason for his credibility finding, that Watashe's testimony was unpersuasive, and he linked that reason to specific evidence.

The ALJ also cited to Watashe's claim that he used a cane even though it had not been prescribed for him and he had not brought it to the hearing. *Id.* He noted that Watashe claimed to use a back brace that he had bought at a garage sale. *Id.* These references by the ALJ to specific evidence supported his view that Watashe was to some extent exaggerating his symptoms.

Watashe contends that the ALJ erred in his credibility determination when stating that Watashe's "treatment has been essentially conservative in nature and no surgery has been recommended." *Id.* It is true that the Tenth Circuit has rejected the notion that surgery is required for one to be disabled. *Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003). However, the Tenth Circuit has approved of credibility determinations that were supported by a finding that the claimant's treatment had been conservative. *See Stokes v. Astrue*, 274 Fed. Appx. 675, 685 (10th Cir. 2008) (unpublished); *Maxwell v. Astrue*, 268 Fed. Appx. 807, 811

12

(10th Cir. 2008) (unpublished); *Sanders v. Astrue*, 266 Fed. Appx. 767, 770 (10th Cir. 2008) (unpublished).  In the present case the ALJ specifically cites to the treating records of Watashe that reflect that treatment was limited to physical therapy and prescriptions for pain medication. (R. 15).  Thus, the undersigned agrees with the ALJ's characterization of Watashe's treatment as conservative in nature and that the limited nature of that treatment undermined Watashe's claim that his pain was totally disabling.  The ALJ's credibility determination was supported by specific reasons linked to substantial evidence, and the undersigned therefore recommends that it be affirmed.

Watashe argues that the testimony that the ALJ cited should not have been viewed as having a negative effect on Watashe's credibility.  Further, Watashe argues that factors such as his work record, demeanor, and objective medical evidence enhance his credibility.  Plaintiff's Opening Brief, Dkt. #15, p. 7.  Watashe's arguments regarding credibility constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  All of the arguments made by Watashe essentially are that Watashe would like for this Court to give more weight to the evidence that is in his favor and less weight to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

The affirming of the ALJ's credibility assessment comes in spite of the ALJ's use of boilerplate language in his credibility assessment.  (R. 15-16).  The ALJ begins his credibility

assessment by stating that Watashe's testimony regarding his impairments and their impact on his ability to perform activities of daily living and other basic functions was "not entirely credible in light of discrepancies between the claimant's alleged symptoms and objective documentation in file." (R. 16). This statement is not linked to any evidence. The Court is left in the dark as to what the ALJ regarded as "discrepancies" between the medical record and Watashe's testimony. Boilerplate statements such as these have been criticized and rejected by the Tenth Circuit. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that [the claimant's complaints] were not credible.").

In the next paragraph, the ALJ discussed Watashe's testimony regarding his activities of daily living:

> First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

(R. 16). Language similar to this has been criticized and rejected by the Tenth Circuit. *Swanson v. Barnhart*, 190 Fed. Appx. 655, 657-58, 2006 WL 2147557 (10th Cir.) (unpublished). The undersigned agrees with the Tenth Circuit's criticism of this language as a boilerplate provision that does not provide the Court with any meaningful reasoning behind the ALJ's decision. The Commissioner should ensure that this language is not used in future ALJ credibility determinations.

However, the inclusion of inapplicable or improper language in the decision does not mean that the ALJ's credibility analysis is fatally flawed. The Tenth Circuit has come to similar conclusions, stating in one case that it had "some concerns" with the ALJ's reliance on the

claimant's failure to follow a weight loss plan and the claimant's performance of minimal household chores. *Branum v. Barnhart,* 385 F.3d 1268, 1274 (10th Cir. 2004). In spite of those concerns, the Tenth Circuit nevertheless affirmed the credibility finding because of other, legitimate factors cited by the ALJ. *Id. See also Rhodes v. Barnhart*, 117 Fed. Appx. 622, 629 (10th Cir. 2004) (unpublished) (even though ALJ's language came close to improper boilerplate, credibility determination was affirmed when the ALJ's "basic thrust" was supported by substantial evidence); *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points). After omitting the cited improper boilerplate provisions, the ALJ's credibility determination was supported by substantial evidence and was in compliance with legal requirements.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 28th day of July, 2010.

_____
Paul J. Cleary
United States Magistrate Judge